

# Virginia Department of Corrections

| | Red Onion State Prison |
|---|---|
| | **Local Operating Procedure** |
| | *830.A Restorative Housing Reduction Step-Down Program* |
| | **Authority:** COV §53.1-10 |
| | **Effective Date:** 10/1/2021 |
| | **Amended:** 10/1/21; 10/1/2020; 6/27/18; 2/18/13 |
| | **Supersedes:** 10/1/2020 |
| | **Access:** ☐ Restricted   ☐ Public   ☒ Inmate |
| | **ACA/PREA Standards:** |

| | | | | |
|---|---|---|---|---|
| **Content Owner:** | Dwayne Turner Chief of Housing and Programs | *(signature)* Signature | 11-15-21 Date |
| **Reviewer:** | Rick White Warden | *(signature)* Signature | 11-9-21 Date |
| **Signatory:** | Carl Manis Regional Administrator | *Carl Manis* Signature | 11/15/2021 Date |

## REVIEW

The Content Owner will review this operating procedure annually and re-write it no later than three years after the effective date.

## COMPLIANCE

This operating procedure applies to all units operated by the Virginia Department of Corrections. Practices and procedures must comply with applicable State and Federal laws and regulations, ACA standards, PREA standards, and DOC directives and operating procedures.

Effective Date: 10/1/21

# Table of Contents

DEFINITIONS ........................................................................................................................................3

PURPOSE ..............................................................................................................................................4

PROCEDURE ........................................................................................................................................4

REFERENCES .....................................................................................................................................17

ATTACHMENTS .................................................................................................................................17

FORM CITATIONS ............................................................................................................................17

## DEFINITIONS

**Dual Treatment Team (DTT)** - A team headed by the Chief of Housing and Programs (CHAP) and representing both ROSP and WRSP; DTT members include but are not limited to: CHAP, Unit Manager, Institutional Program Manager (IPM), Intelligence Officer, Mental Health Associate, Facility Medical Director, Counselor, Correctional Officer, an/or any other staff member with relevant information that is assigned by the respective facility's CHAP.

**Security Level S-** A non-scored security level reserved for inmates who must be managed in a Restorative Housing setting; Level S inmates are assessed and assigned to:

- **Intensive Management (IM), Security Level S-** Inmates with the potential for extreme and/or deadly violence; they may have an institutional adjustment history indicating the capability for extreme/deadly violence against staff or other inmates. This group most often would have an extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic. The potential for extreme or deadly violence is not eliminated despite the inmate's daily institutional behavior. Alternatively, the inmate may present a routinely disruptive and threatening pattern of behavior and attitude.

- **Special Management (SM), Security Level S-** Inmates who may display an institutional behavior history indicating repeated disruptive behavior at lower level facilities, a history of fighting with staff or inmates and/or violent resistance towards a staff intervention resulting in harm to staff, other inmates, and where reasonable intervention at the lower security level have not been successful in eliminating disruptive behaviors.

**Security Level 6 (SL6)** - The inmate's first step down from Level S into general population; there will be greater opportunities to socialize with other inmates. Security Level 6 inmates will be managed in accordance with Restorative Housing Reduction Step-Down Program. Level 6 inmates are assessed and assigned to:

- **Intensive Management Security Level 6 Closed Pod (IM-SL6)** - Housing reserved for inmates, possibly facing long term in high security, who have successfully completed necessary programming required to step down from Security Level S into Level 6.

- **Special Management 2 (SM) (SL6)** - Housing reserved to acclimate inmates that have been Security Level S. This is the first privilege level in which an SM inmate will be changed from Security Level S to security level 6. SM2 inmates will have recreation in un-restrained small groups (maximum of 5).

- **Secured Integrated Pod (SIP) (SL6)** - Housing reserved for inmates who express resistance to out of cell activities or a general population environment and/or display a pattern of intentionally committing minor disciplinary violations to ensure they are placed in Restorative Housing; programming will focus on strategies to reintegrate inmates into a general population setting in preparation for advancement to a lower security level.

- **Secured Allied Management (SAM) (SL6)** - Housing reserved for inmates who may

> be vulnerable to victimization by other inmates as a result of their cognitive impairment; programming will focus on stabilization and increasing their resiliency to determine if they are appropriate for living in general population.

> **Step-Down Pods Phase I and II (SL6)** - Pods designed for inmates in preparation for transfer to lower security level; programming will focus on beginning the process of re-socialization following potentially lengthy periods housed in Restorative Housing. Inmates will work toward participation in limited general population activities such as but no limited to recreation, meals, programming, etc.

**Re-Entry Unit** - Security Level 6 incentive based special housing units that house inmates with 24 months or less remaining on their sentence; re-entry units provide programs designed to prepare inmates to re-enter society. Some services provided during re-entry are education, job training, and risk assessment. Level S inmates with 24 months or less to re-entry will be directed into a Level 6 re-entry program that incorporates accelerated stages of security with the goal of providing a period of socialization prior to release to the community.

**Building Management Team** - A multi-disciplinary team comprised of staff assigned to work in the housing unit that tracks, measures, and advances or lowers inmates to appropriate privilege levels based on established criteria. Members may consist of Unit Manager, Security Supervisors, Counselor, Officer, Mental Health and Investigator. Additional members can be included as needed.

## PURPOSE

Red Onion State Prison (ROSP) and Wallens Ridge State Prison (WRSP) have established procedures for incentive based inmate management which will create a pathway for inmates to step-down from security level S to lower security levels in a manner that maintains public, staff and inmate safety. The established procedure infuses evaluation tools into the operational design by establishing observable and measurable standards to ensure fidelity in inmate management services and programming. This operating procedure provides re-entry transition services by helping to motivate inmates in making appropriate pro-social choices and provide effective programming to assist inmates with making a successful reduction in security level while at the same time providing opportunities for successful re- entry into their communities upon release from incarceration.

## PROCEDURE

A. Eligibility Criteria for Assignment to Security Level S

1. While Level S is not a scored security level, it is a type of housing reserved for special purpose bed assignment which is utilized by facilities under proper administrative process for the protective care and management of inmates.

2. The Level S Qualifiers listed in Operating Procedure 830.2, *Security Level Classification,* indicate that an inmate should be considered for assignment to Security Level S. Extreme consideration will be given to inmates who meet the following criteria:

   a. Aggravated Assault on staff

b. Aggravated Assault on Inmate w/weapon or Resulting in Serious Injury w/o weapon

c. Serious Escape Risk - requiring maximum security supervision

d. Commission of Crime of Exceptional Violence and/or Notoriety

e. Excessive Violent Disciplinary Convictions - reflecting inability to adjust to a lower level of supervision

f. Setting Fire Resulting in Injury to Persons or Extensive Damage to State Property

g. Rioting resulting in Injury to Persons or Extensive Damage to State Property

h. Seizing or Holding Hostages

i. Possession of Firearms, Ammunition, Explosives, Weapons

j. Knowingly Transferring HIV or other Disease to Another Person or Refusal to Submit to Testing

k. Gang Activity Related to any Category 1 Offense or a Documented Gang Leadership Role

l. Staff Manipulator Predator

m. Behavior that represents a threat level to great for the safety and security of a lower level institution

3. An inmate may be assigned to Security Level S through Institutional Classification Authority (ICA), Central Classification Services Review (CCS), Warden of ROSP, Western Regional Operations Chief(ROC) or designee Regional Administrator (RA). The Warden of ROSP and Western Regional Operations Chief or designee will have final approval for the increase of Security Level S.

B. Intake, Orientation, and Assessment

1. All Level S inmates arriving at ROSP will be initially housed in the Intake/Orientation Unit which is managed as Special Housing in accordance with Operating Procedure 425.4, *Management of Bed and Cell Assignments (Restricted),* and Operating Procedure 841.4, *Restorative Housing Units*

a. Upon arrival, inmates will be provided an orientation and case plan including goals, expectations, privilege earning process, and step-down process.

b. A primary goal of orientation is to begin a positive rapport, motivate inmates to want to participate in the assessment process and step-down program, and outline the expectation and benefits the inmate can anticipate.

c. Programming will begin during the inmate's stay in the Intake/Orientation unit.

d. At the completion of the Intake/Orientation process, inmates will be referred to the Dual Treatment Team where they will assign an inmate to either Intensive Management (IM) or Special Management (SM) path based on their identified risk level.

C. Screening and Assessment - An initial battery of assessments will be used to establish a baseline for each inmate. Assessments will be repeated at mid-point and completion of each major program curriculum (the Challenge Series, Thinking for a Change, and other possible curricula) to measure change.

1. Counselors will engage inmates in a review of the findings from the assessment instruments and use Effective Communication skills to:

a. Build Rapport

b. Validate the Inmate's profile including risks and needs

c. Engage the inmate in developing a program and management plan

d. Help improve the inmate's motivation to participate in the Step-Down program

2. Each Security Level S inmate will complete a battery of assessment instruments duringIntake Orientation to include the following:

a. COMPAS - The findings from the COMPAS will be used to reach the following goals:

   - Program Planning - Support development of Program/Management Path plans based on identified risks and needs.

   - Criminal Thinking Scales (CTS) - Introduced at intake to create a baseline of criminogenic thinking and repeated at intervals to measure change in criminal thinking.

b. TCU Criminogenic Scales
   1. Social Function Scales (SOC)
   2. Psychological Functioning Scales (PSY)
   3. Treatment Needs and Motivations Scales (MOT) (as needed)
   4. Treatment Engagement and Process Scales (ENG) (as needed)

D. Intensive Management Pathway (IM)

1. IM privilege levels are IMO, IM1, IM2 and IM-SL6

   a. IM-0 is the initial privilege level for inmates being placed in the IM-Pathway. Inmates who choose to participate in the Restorative Housing Reduction Step-Down Program, may progress to higher IM privilege levels. Inmate choosing not to participate in the Step-Down program will remain at IM-0 Status and will receive the basic requirements set forth in Restorative Housing Reduction Step-Down Program.

   b. Security Level VI is the lowest security level for inmates in the IM Pathway.

2. Inmates on the Intensive Management Pathway will be afforded privileges in accordance with the Intensive Management Privilege Level Chart, Attachment 1. Assignment to privilege levels will be done by the Building Management Team. Building Management Team actions should be done informally as a program assignment.

3. Intensive Management Status Level Goals

   a. Inmates participating in the Step-Down Program will be challenged to meet goals in three areas:
      1. Disciplinary Violation goals - To reduce or eliminate disciplinary violations
      2. Responsible behavior goals
         - Personal Hygiene
         - Standing for count
         - Cell Compliance

will review all such actions.

F. Level 6; SIP, SAM and Step-Down

   1. Following a successful period in IM or SM, inmates will be eligible for advancement and to step- down from Level S to their first introduction into general population at Security Level 6.

   a. Prior to advancement to Security Level 6, each inmate will be formally reviewed by the Institutional Classification Authority (ICA) in accordance with Operating Procedure 830.1, *Institution Classification Management.*
   1. Recommendations for advancement to Level 6 will be referred to the Dual Treatment Team.
   2. The Dual Treatment Team will escalate their recommendations to the Warden for final decision.

   b. The purpose of Level 6 is to reintroduce inmates into a social environment with other inmates,and to serve as a proving ground and preparation for stepping down to Level 5.

   c. At Level 6, Inmates are assigned to an appropriate program pod based upon the common characteristics and motivations that resulted in the inmate's assignment to Level S initially.

   d. The various program pods are designed to be responsive to the common goals for each sub-population: I/M Closed Pod, Secure Allied Management Pod/Secure Integrated Pod (SAM SIP), Level 6 Re-Entry, or Step-Down Pod

   A. Step Down Phase I

   a. Single Celled

   b. Unrestrained to shower and recreation

   c. In-Pod group recreation one (1) tier at a time daily

   d. Outside group recreation one (1) tier at a time daily

   e. Programming will be conducted in small groups. The primary curriculum will be Thinking for a Change which may be supplemented with additional curriculum. The amount of inmates placed within the group will be consistent with Thinking for a Change protocols.

   f. Walk to meals One (1) tier at a time with no more than one tier in the dining hall at a time.

   B. Step Down Phase II

   a. Double celled when appropriate

   b. Unrestrained to shower and recreation

   c. In-Pod group recreation one (1) tier at a time daily

   d. Outside group recreation one (1) tier at a time daily

   e. Programming will be conducted in small groups. The primary curriculum will be Thinking for a Change which may be supplemented with additional curriculum. The amount of inmates placed within the group will be consistent with Thinking for a Change protocols.

f. May walk to meals one (1) tier at a time with no more than one tier in the dining hall at a time.

2. Step-Down Pod - Security Level 6

a. The Step-Down program is for previously SM inmates that do not meet the criteria for SAM or SIP. (IM inmates are not eligible for Step-Down Phase I/11) These are inmates with a lengthy history of disciplinary behavior including assaults (but do not rise to the level of danger reserved for IM status), or multiple charges for non-compliance with facility rules. They have also satisfactorily completed the requirements for SM1 and SM2 indicating a new pattern of complying with rules and appropriate interactions with staff and other inmates. They will have also completed the Challenge Series Programming increasing the likelihood for a change in thinking and attitude and an increased sense of responsibility and maturity.

3. Secured Allied Management Pod (SAM) Secure Integrated Pod (SIP)

a. The SIP/SAM pod is designed for inmates who have a pattern of intentionally committing numerous minor disciplinary violations to ensure they are retained in Restorative Housing rather than returned to General Population. Programming will focus on strategies to socially reintegrate inmates in preparation for advancement to Level 5.

b. The following management protocols are in place for both SIP and SAM units:
   1. Single-Celled Housing
   2. Meals will be eaten in cell
   3. Move unrestrained to shower and recreation
   4. Programming will be delivered in Secure Chairs or small groups in the pod
   5. The Challenge Series must be completed prior to entering these programs
   6. Options: At a minimum of 30 days, inmates may participate in the following options upon being reviewed and approved by the building management committee:
      - Group Meals in pod up to one (1) tier at a time
      - In-pod group recreation up to one (1) tier at a time
      - Outside group recreations up to one (1) tier at a time

4. Level 6; IM Closed Pod

a. Following a successful period in IM, inmates will be eligible for advancement and to step-down from Level S to their first introduction into general population at Level 6. The purpose of IM Level 6 is to create an opportunity for an increased quality of life for inmates possibly facing a long term in high security.

b. IM Closed Phase 1 inmates in Level 6 will continue to be managed per Special Housing Guidelines policy 841.4 to include single celled housing, segregated recreation, and out of cell restraints. Pod workers will wear a level of restraints deemed appropriate by the Unit Manager to maintain safety and security. Security Level 6, Phase I IM Closed Inmates will have increased

privileges over Level-S. Phase 1, IM inmates can earn eligibility for additional privileges to include:

1. Limited in-pod job assignments, (meeting specific eligibility criteria)
2. Programming in-cell and in secure chairs in small groups
3. Video visitation and extended in person visitation
4. Productive activities such as a structured art program and creative writing with out of cell meetings in secure chairs
5. Food Service Support projects out of cell at a secure workstation.

c. Inmates who have advanced to Phase II of this program will have the opportunity to earn eligibility for additional privileges to include:

1. Continued privileges outlined in Phase I
2. Contact visitation in secure chair
3. Extended Commissary spend limits

d. Upon a 12 month, successful and charge free housing assignment in IM Closed Phase I, an inmate may be eligible to progress to IM Closed Phase II, upon approval by the Building Management Committee

e. IM Closed Phase II inmates may receive the same privileges as inmates assigned to IM Closed Phase I in addition to; increased commissary spend limit and additional phone usage. Inmates assigned to IM Closed Phase II may be allowed to move individually to and from specified activities, such as recreation and showers at the discretion of the building committee.

G. Enhanced Security Options

1. Level S Inmates will be managed in accordance with Operating Procedure 425.4, *Management of Bed and Cell Assignments (restricted)*, and Operating Procedure 841.4, *Restorative Housing Units*

2. As part of this initiative, a number of advanced security measures, beyond required procedures, are being instituted to enhance officer safety to include, but not limited to, the following:

a. All Restorative Housing inmate property may be x-rayed during cell shakedowns and bed moves.

b. During cell searches, shakedowns, or bed moves the BOSS (Body Orifice Security Scanner) chair may be used to detect the presence of metal contraband that might be concealed inside the inmates' body.

c. Two officers will be stationed on the floor during any inmate movement in buildings housing SL-6.

d. A K-9 will be present outside of the housing units during any out of cell movement including showers, recreation, and movement to the Therapeutic Modules or Program Chairs for programming or work for security level 6 inmates.

e. Following any incident involving the use of restraints (ambulatory restraints, 5-point humane restraints, the use of a security strip cell) the inmate's behavior will be reviewed by the Unit Manager and/or members of the Building Management Committee before the inmate is returned to normal management status.

f. Therapeutic Modules and Security Chairs will be used to allow Level S inmates to come out of cell for individual interviews or to join small groups facilitated by a Treatment Staff. This increases the effectiveness of programming while ensuring safety for both staff and other inmates.

H. Level S/Level 6 Reentry Program

1. A Level S /Level 6 Re-Entry Program has been developed at ROSP for inmates within the SM and IM pathways. These programs will address many of the identified risks and needs and prepare the inmate for return to the community. The Re-Entry program includes an accelerated level of programming and appropriate social interactions between the inmate, staff, and other inmates as part of a broader re-entry strategy to prepare them for return to the outside community. At two-years prior to release, Level S and Level 6 inmates will be diverted into the Level S/Level 6 Reentry Program from whatever point they may be in the Level S step-down program. This will allow ample time to develop a success-based re-entry plan to obtain a GED, complete vocational training and to build a sufficient savings account.

2. Each inmate diverted into the reentry path should have their assessments reviewed or updated to include COMPAS assessments (risk/needs, CTS) by the Unit Manager and the Building Management Committee. Additionally, a Psychological Self-Efficacy Evaluation may be completed which will help assess the inmate's level of self-reliance, considered an important factor in their reliability to accomplish the multitude of tasks facing them at re-entry. This Evaluation will be conducted by a Mental Health Psychology Associate and the results discussed with the Unit Manager and the Building Management Committee

3. Upon completion of the assessment, the inmate will be aligned with the appropriate programming.

Some of the programs that are offered may include but are not limited to the following:

- Aggressive Alternative Skills
- Resources for Successful Living
- P.R.E.P.S.
- Challenge Series
- Thinking for a Change
- Thinking for a Change Aftercare
- ServSafe
- Ready to Work
- Re-Entry Planning
- Re-Entry - Skills for Successful Living
- Re-Entry - Money Smart
- Decision Points

I. Level 6 Re-Entry

    1. The first six months of re-entry programming will be delivered to the inmates in the Security Chairs. In the second six-months inmates may be advanced to unsecured direct contact with staff that will occur one to one. During this time, the inmates may advance to small groups for programming with other reentry inmates participating in the program. The assessment of the inmate's readiness to advance will be determined by the Unit Manager and the Building Management Committee. Some factors to be considered are: the behavior patterns of the inmate, the willingness of the inmate to participate in programming and the inmate's participation

    2. Special security measures can be implemented when needed to include specialized movement, programming being delivered by specially trained treatment officers, having K-9 present in front of the housing unit or additional officers present within the Reentry Pod. The decision to adapt the security measures would be made by the Unit Manager and the Building Management Committee.

    3. Progression from restrained to unrestrained movement in Level 6 Re-Entry will be determined with the approval of the building committee.

    4. For the final ten (10) months of reentry, Level 6 Re-Entry inmates may be reduced to Level 5 and transferred to a security level 5 intensive re-entry site.

J. Review of Inmate Classification Assignments

    1. Bi-Annual External Review Team

        a. A team external to ROSP and WRSP will perform bi-annual reviews of each inmate's case assigned to ROSP and WRSP in Security Levels S and Security Level 6. The review will include, but not be limited to, the following areas:

           1. Is the inmate currently appropriately assigned to Level S?
           2. Does the inmate meet the criteria for the Intensive Management or Special Management path to which they are assigned?
           3. Does the inmate require a pathway change at this time?
           4. Has the Dual Treatment Team made appropriate decisions to advance the inmate through the step-down process?

        b. The External Review Team will consist of the following members or designee:
           1. Security Operations Manager, Chairman
           2. Regional Operations Chief of the Eastern and Central Regions
           3. Chief of Inmate Management
           4. Manager of Classification and Records
           5. Evidence Based Practice Operations Administrator
           6. Chief of Mental Health Services
           7. Chief Nurse

K. Western Regional Operations Chief, External Review

a. The Regional Operations Chief/Regional Administrator will provide an external review in the following situations:

1. In advance of inmate movement from any facility to ROSP for placement in Level S; the Regional Operations Chief must approve the transfer of any inmate to ROSP and assignment to Level S.

2. In advance of any change in inmate classification level including:

(a) Reassignment from a lower classification (other than security level 6) to Level S

(b) Reassignment from Level S to Level 6; the Regional Operations Chief or designee will review cases in which the two Wardens do not agree.

(c) Reassignment from Level 6 to Level 5

b. Wardens Review - Wardens are responsible for the following decisions:

1. For reassignment from Level S to Level 6 or Level 6 back to Level S, the decision will be made by the Warden of ROSP.

2. For reassignment from Level 6 to Level 5, the recommendation will be made by the Warden of ROSP with an External Review by the Regional Operations Chief Regional Administrator.

3. For Level-5 transfers from ROSP to WRSP, the decision will be made by consensus of the ROSP and WRSP Wardens. If consensus cannot be reached, the decision will be referred to the Regional Operations Chief

c. Central Classification Services (CCS) Review

1. Reassignment from any all lower classification (security level 1-5) to Level S will result in the following approval process: Referring facility->Central Classification Services- Warden of the primary Maximum Security Prison (currently ROSP)->Regional Operations Chief (ROC) or designee Regional Administrator (RA)

2. The Warden and Western Regional Operations Chief or designee will have final approval for the increase of security level

d. Dual Treatment Team Review

1. The Dual Treatment Team (DTT) refers to a team headed by both Chiefs of Housing and Program representing both ROSP and WRSP. Representatives from both ROSP and WRSP will make up the DTT may include, but not limited to, the following individuals or their designees:

- Chief of Housing and Programs
- IPM / Cognitive Counselor
- Unit Manager
- Investigator/ Intelligence Officer
- Mental Health Associate
- Counselor (s) - Counselors directly involved in the management of the inmates beingreviewed should be utilized.
- Corrections Officer - When possible, line staff members directly involved with themanagement of the inmates being reviewed should be involved.

The Dual Treatment Team is responsible to review individual inmates and make certain recommendations. Recommendations by the team are reached through dialogue and consensus. Decisions will not be made by a voting majority. The team is responsible to consider a variety of options when necessary until a recommendation is reached which all members can support. If there is difficulty reaching a consensus, then the team should default to the safer options. Decisions are the responsibility of the Wardens and Regional Operations Chief. The Dual Treatment Team is be responsible for the following reviews and recommendations:

- The Dual Treatment Team will meet and interview inmates as part of the process in determining the inmates pathway
- Assignment of Level S Intake/Orientation inmates at ROSP to IM or SM status
- Assigning IM & SM inmates from Level S to Level 6
- Review of the Mental Health Associate assessments on any mental health services provided for serious mental illness to include but not limited to crisis intervention, screening, psychological assessment and psychoeducational services, individual and group therapy, treatment planning, that may contribute to the appropriate housing.

3. The work of the Dual Treatment Team requires not only an understanding of the criteria for the different inmate sub-groups, but also the use of judgment especially when making recommendations regarding IM inmates, level of danger and assignment to appropriate pathways. This committee will meet as circumstances deem necessary. Factors the Dual Treatment Team should review would include:
   - Identifying possible inmate motivators and triggers,
   - Investigating not only institutional adjustment history but the history of street behavior and crimes,
   - Considering inmate intent in addition to the results of their actions,
   - Review and interpretation of assessment results (COMPAS)

e. The Building Management Committee refers to a grouping of individuals directly involved in the operations of a specific unit at ROSP and WRSP. These committees will convene at least monthly to discuss inmate statuses and unit incentives and sanctions. This grouping will be made up of but not limited to the following individuals:
   - Chief of Housing and Programs
   - Unit Manager
   - Counselor

- Unit Security Supervisors
- Security Line Staff
- Treatment Officers
- Mental Health Associate

f. The Building Management Committee is responsible to review individual inmates and make certain recommendations. Recommendations by the team will be made through dialogue and consensus. Decisions will not be made by a voting majority. The team is responsible for considering a variety of options when necessary until a recommendation is reached which all members can support. If there is difficulty reaching consensus, then the team should default to the safer options. Decisions are the responsibility of the Chief of Housing and Programs. The Building Management Committee is responsible for the following reviews and recommendations:

- Assigning inmates to SM0 and SM1
- Assigning inmates to IMO, IM1, and IM2.
- Assigning inmates to return to earlier levels due to excessive disciplinary behavior or unsatisfactory performance.
- Discussing and preparing recommendations to be presented to the Dual Treatment Team and ICA.
- Discussing and adjusting individual pod incentives and sanctions based on behavior, infractions, incidents, etc.
- Reviewing individual inmates upon being removed from security protocols due to behavioral issues and prior to being returned to normal status, i.e. five point restraints, ambulatory restraints, security strip cell.

g. Institutional Classification Authority

a. Each Level S inmate will be reviewed at a minimum of every 90 days by the ICA, or more frequently as necessary, to ensure the reclassification of Level S inmates is consistent with policy.

## REFERENCES
Operating Procedures:
425.4 Management of Bed and Cell Assignment
830.1 Institution Classification Management
830.2 Security Level Classification
841.4 Restorative Housing Units

## ATTACHMENTS
Attachment 1 - Intensive Management Privilege Level Chart
Attachment 2 - Special/Intensive Management Status Rating Chart
Attachment 3 - Special Management Privilege Level Chart

## FORM CITATIONS



# Virginia Department of Corrections

| | |
|---|---|
| | **Red Onion State Prison** |
| | **Local Operating Procedure** |
| | ***830.A-Restorative Housing Reduction Step-Down Program*** |
| | **Authority:** COV §53.1-10 |
| | **Effective Date:** 01/01/2024 |
| | **Amended:** |
| | **Supersedes:** 10/1/2021 |
| | **Access:** ☐ Restricted   ☐ Public   ☒ Inmate |
| | **ACA/PREA Standards:** 5-ACI-4A-19 |

| Content Owner: | Amee Duncan<br>Chief of Housing and Programs | *[signature]* | 2/7/24 |
| | | Signature | Date |
| Reviewer: | Rick White<br>Warden | *[signature]* | 2/7/24 |
| | | Signature | Date |
| Signatory: | Thomas Meyer<br>Regional Administrator | *Thomas Meyer* | 2/9/2024 |
| | | Signature | Date |

## REVIEW

The Content Owner will review this operating procedure annually and re-write it no later than three years after the effective date.

## COMPLIANCE

This operating procedure applies to Red Onion State Prison operated by the Virginia Department of Corrections. Practices and procedures must comply with applicable State and Federal laws and regulations, ACA standards, PREA standards, and DOC directives and operating procedures.

Local Operating Procedure                                                    Effective Date: 10/1/21

## Table of Contents

DEFINITIONS ................................................................................................................................3

PURPOSE ......................................................................................................................................4

PROCEDURE .................................................................................................................................4

REFERENCES ..............................................................................................................................17

ATTACHMENTS ..........................................................................................................................17

FORM CITATIONS ......................................................................................................................17

Local Operating Procedure                                                Effective Date: 10/1/21

## DEFINITIONS

**Dual Treatment Team (DTT)** - A team headed by the Chief of Housing and Programs (CHAP) and representing both ROSP and WRSP; DTT members include but are not limited to: CHAP, Unit Manager, Institutional Program Manager (IPM), Intelligence Officer, Mental Health Associate, Facility Medical Director, Counselor, Correctional Officer, an/or any other staff member with relevant information that is assigned by the respective facility's CHAP.

**Security Level S-** A non-scored security level reserved for inmates who must be managed in a Restorative Housing setting; Level S inmates are assessed and assigned to:

- **Intensive Management (IM), Security Level S-** Inmates with the potential for extreme and/or deadly violence; they may have an institutional adjustment history indicating the capability for extreme/deadly violence against staff or other inmates. This group most often would have an extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic. The potential for extreme or deadly violence is not eliminated despite the inmate's daily institutional behavior. Alternatively, the inmate may present a routinely disruptive and threatening pattern of behavior and attitude.

- **Special Management (SM), Security Level S-** Inmates who may display an institutional behavior history indicating repeated disruptive behavior at lower level facilities, a history of fighting with staff or inmates and/or violent resistance towards a staff intervention resulting in harm to staff, other inmates, and where reasonable intervention at the lower security level have not been successful in eliminating disruptive behaviors.

**Security Level 6 (SL6)** - The inmate's first step down from Security Level S into general population; there will be greater opportunities to socialize with other inmates. Security Level 6 inmates will be managed in accordance with Restorative Housing Reduction Step-Down Program. Security Level 6 inmates are assessed and assigned to:

- **Intensive Management Security Level 6 Closed Pod (IM Closed)** - Housing reserved for inmates, possibly facing long term in high security, who have successfully completed necessary programming required to step down from Security Level S into Level 6.

- **Special Management 2 (SM2)**- Housing reserved to acclimate inmates that have been Security Level S. This is the first privilege level in which an SM inmate will be changed from Security Level S to Security Level 6. SM2 inmates will have recreation in un-restrained small groups (maximum of 5).

- **Secured Allied Management (SAM)**- Housing reserved for inmates who may be vulnerable to victimization by other inmates as a result of their cognitive impairment; programming will focus on stabilization and increasing their resiliency to determine if they are appropriate for living in general population.

Local Operating Procedure                                                    Effective Date: 10/1/21

- **Step-Down Pods Phase I and II (SL6)** - Pods designed for inmates in preparation for reduction of their security level; programming will focus on continuing the process of re-socialization following potentially lengthy periods housed in Restorative Housing. Inmates will work toward participation in limited general population activities such as but not limited to recreation, meals, programming, etc.

- **Re-Entry Unit** - Security Level 6 incentive based units that house inmates with 24 months or less remaining on their sentence; re-entry units provide programs designed to prepare inmates to re-enter society. Some services provided during re-entry are education, job training, and risk assessment. Security Level S inmates with 24 months or less to re-entry will be directed into a Security Level 6 re-entry program that incorporates accelerated stages of security with the goal of providing a period of socialization prior to release to the community.

**Building Management Committee** - A multi-disciplinary committee comprised of staff assigned to work in the housing unit that tracks, measures, and advances or lowers inmates to appropriate privilege levels based on established criteria. Members may consist of the Chief of Housing and Programs (CHAP), Unit Manager, Security Supervisors, Counselor, Officer, Mental Health, Investigator and Treatment Officer. Additional members can be included as needed.

## PURPOSE

This procedure was established for incentive-based inmate management to create a pathway for inmates to step-down from Security Level S to lower security levels in a manner that maintains public, staff and inmate safety. The established procedure infuses evaluation tools into the operational design by establishing observable and measurable standards to ensure fidelity in inmate management services and programming. This operating procedure provides re-entry transition services by helping to motivate inmates in making appropriate pro-social choices and provide effective programming to assist inmates with making a successful reduction in security level while at the same time providing opportunities for successful re- entry into their communities upon release from incarceration.

## PROCEDURE

### A. Eligibility Criteria for Assignment to Security Level S

1. While Security Level S is not a scored security level, it is a type of housing reserved for special purpose bed assignment which is utilized by facilities under proper administrative process for the protective care and management of inmates.

2. The Security Level S Qualifiers listed in Operating Procedure 830.2, *Security Level Classification*, indicate that an inmate should be considered for assignment to Security Level S. Extreme consideration will be given to inmates who meet the following criteria:

   a. Aggravated Assault on staff

   b. Aggravated Assault on Inmate w/weapon or Resulting in Serious Injury w/o weapon

   c. Serious Escape Risk - requiring maximum security supervision

d.  Commission of Crime of Exceptional Violence and/or Notoriety

e.  Excessive Violent Disciplinary Convictions - reflecting inability to adjust to a lower level of supervision

f.  Setting Fire Resulting in Injury to Persons or Extensive Damage to State Property

g.  Rioting resulting in Injury to Persons or Extensive Damage to State Property

h.  Seizing or Holding Hostages

i.  Possession of Firearms, Ammunition, Explosives, Weapons

j.  Knowingly Transferring HIV or other Disease to Another Person or Refusal to Submit to Testing

k.  Gang Activity Related to any Category I Offense or a Documented Gang Leadership Role

l.  Staff Manipulator/ Predator

m.  Behavior that represents a threat level to great for the safety and security of a lower level institution

3.  An inmate may be assigned to Security Level S through Institutional Classification Authority (ICA), Central Classification Services Review (CCS), Warden of ROSP, Western Regional Operations Chief(ROC) or designee Regional Administrator (RA). The Warden of ROSP and Western Regional Operations Chief or designee will have final approval for the increase of Security Level S.

## B. Intake, Orientation, and Assessment

1.  All inmates pending Security Level S arriving at ROSP will be initially housed in the Intake/Orientation Unit, which is managed in accordance with Operating Procedure 425.4, *Management of Bed and Cell Assignments (Restricted),* and Operating Procedure 841.4, *Restorative Housing Units.*

a.  Upon arrival, inmates will be provided an orientation and case plan including goals, expectations, privilege earning process, and step-down process.

b.  A primary goal of orientation is to begin a positive rapport, motivate inmates to want to participate in the assessment process and step-down program, and outline the expectation and benefits the inmate can anticipate.

c.  Education, Medical and Mental Health staff will be notified immediately upon arrival of any inmate into the Security Level S intake/orientation unit. All inmates shall be provided with a medical evaluation and a mental health evaluation within one working day of assignment.

d.  Inmates will be offered a minimum of four hours out of cell activity cell programmatic interventions or other congregate activities per day aimed at promoting personal development or addressing underlying causes of problematic behavior. Out of cell time may include recreation in a congregate setting unless exceptional circumstances mean that doing so would create significant and unreasonable risk to the safety and security of other inmates, the staff, or the institution. Staff may offer an inmate less than four hours of out-of-cell programmatic interventions or other congregate activities per day only when the Facility Unit Head determines a lockdown is required to ensure the safety of the institution.

e.  Programming will begin during the inmate's stay in the Intake/Orientation unit.

Local Operating Procedure                                                    Effective Date: 10/1/21

f. At the completion of the Intake/Orientation process, inmates will be referred to the Dual Treatment Team where they will assign an inmate to either Intensive Management (IM) or Special Management (SM) pathway based on their identified risk level.

### C. Screening and Assessment

Initially several assessments will be used to establish a baseline for each inmate. Assessments will be repeated at mid-point and completion of each major program curriculum (the Challenge Series, Thinking for a Change, and other possible curriculum) to measure change.

1. Counselors will engage inmates in a review of the findings from the assessment instruments and use Effective Communication skills to:

   a. Build Rapport

   b. Validate the Inmate's profile including risks and needs

   c. Engage the inmate in developing a program and management plan

   d. Help improve the inmate's motivation to participate in the Step-Down program

2. Each Security Level S inmate will complete several assessment instruments during Intake/Orientation to include the following:

   a. COMPAS -The findings from the COMPAS will be used to reach the following goals:

   - Program Planning - Support development of Program/ Management Pathway plans based on identified risks and needs.

   - Criminal Thinking Scales (CTS) - Introduced at intake to create a baseline of criminogenic thinking and repeated at intervals to measure change in criminal thinking.

   b. TCU Criminogenic Scales/Criminal Thinking Scales (CTS)- Introduced at intake to create a baseline of criminogenic thinking and repeated at intervals to measure change in criminal thinking.

      1. Social Function Scales (SOC)
      2. Psychological Functioning Scales (PSY)
      3. Treatment Needs and Motivations Scales (MOT) (as needed)
      4. Treatment Engagement and Process Scales (ENG) (as needed)

### D. Intensive Management Pathway (IM)

1. IM privilege levels are IM0, IM1, IM2 and IM-SL6 Closed

   a. IM0 is the initial privilege level for inmates being placed in the IM Pathway. Inmates who choose to participate in the Restorative Housing Reduction Step-Down Program, may progress to higher IM privilege levels. Inmates who choose not to participate in the Step-Down Program will remain at IM0 and will receive the basic requirements set forth in Restorative Housing Reduction Step-Down Program.

   b. Security Level 6 is the lowest security level for inmates in the IM Pathway.

2. Inmates on the Intensive Management Pathway will be afforded privileges

in accordance with the Intensive Management Privilege Level Chart, Attachment 1. Assignment to privilege levels will be done by the Building Management Committee. Building Management Committee actions should be done informally as a program assignment.

3. Intensive Management Status Level Goals

   a. Inmates participating in the Step-Down Program will be challenged to meet goals in three areas:

      1. Disciplinary Violation goals –To reduce or eliminate disciplinary violations

      2. Responsible behavior goals

- Personal Hygiene
- Standing for count
- Cell Compliance
- Deportment; satisfactory rapport with staff and inmates

      3. Program participation goals

- To participate in programs initially in-cell and eventually moving to therapeutic modules, program chairs.

   b. As inmates meet goal levels, they will be eligible to advance from IM0, IM1, to IM2. As inmates advance in status, they will earn additional privileges (outlined on a separate IM Privilege Level Chart).

   c. Rating System– To be documented on Special/Intensive Management Status Rating Chart, Attachment 2

      1. The Unit Manager (or designee) will track each inmate's charges.

      2. Responsible Behavior will be rated each week by Correctional Officers, Counselors, and the Unit Manager as *"poor, acceptable, or good"* in each category (cell compliance, personal hygiene, standing for count, and respect)

      3. Treatment Officers will rate each inmate's program participation for that week as either *"incomplete, complete or positive effort."*

   d. It is valuable for Officers, Counselors, and the Unit Manager to communicate with each inmate routinely on their ratings as an opportunity to acknowledge positive performance as well as to motivate them to improve when needed.

4. Assignment to Lower Incentive Level

   a. Inmates that do not meet the standards for disciplinary, responsible behavior, and/or self-improvement and programming can be placed back to a lower incentive level by decision of the Building Management Committee.

   b. When an inmate receives a serious disciplinary offense or refuses over a period of time to meet standards for responsible behavior or program participation, the Building Supervisor or higher authority can decide to immediately lower an inmate's status. The Building Management Committee will review all such actions.

**E. Special Management Pathway (SM)**

1. SM privileges are SM0, SM1, SM2, and SM-SL6

2. SM0 is the initial privilege level for inmates being placed in the SM Pathway. Inmates who choose to participate in the Step-Down Program, may progress to higher SM privilege levels. Inmates who choose not to participate in the Step-Down Program will remain at SM0 and will receive the basic requirements set forth in Operating Procedure 841.4.

3. Inmates on the Special Management Pathway will be afforded privileges in accordance with the Special Management Privilege Level Chart, Attachment 3. Assignment to privilege levels will be done by the Building Management Committee. Building Management Committee actions should be done informally as a program assignment.

4. Special Management Status Level Goals

   a. Inmates participating in the Step-Down Program will be challenged to meet goals in three areas:
      1. Disciplinary Violation goals - To reduce or eliminate disciplinary violations.
      2. Responsible behavior goals
         - Personal Hygiene
         - Standing for count
         - Cell Compliance
         - Deportment; satisfactory rapport with staff and inmates
      3. Program participation goals
         - To participate in programs initially in-cell and eventually moving to therapeutic modules, program chairs, and finally to unrestrained during counseling and small group programming.

   b. As inmates meet goal levels, they will be eligible to advance from SM0, SM1 to SM2. As inmates advance in status, they will earn additional privileges (outlined on a separate SM Privilege Level Chart).

   c. Rating System to be documented on Special/Intensive Management Status Rating Chart, Attachment 2
      1. The Unit Manager (or designee) will track each inmate's charges
      2. Responsible Behavior will be rated each week by Correctional Officers, Counselors, and the Unit Manager as *"poor, acceptable, or good"* in each category (cell compliance, personal hygiene, standing for count, and respect)
      3. Treatment Staff will rate each inmate's program participation for that week as either *"incomplete, complete or positive effort"*

   d. It is valuable for Officers, Counselors, and the Unit Manager to communicate with each inmate routinely on their ratings as an opportunity to acknowledge positive performance as well as to motivate them to improve when needed.

5. Assignment to Lower Incentive Level

a. Inmates that do not meet the standards for disciplinary, responsible behavior, and/or self-improvement and programming can be placed back to a lower incentive level by decision of the Building Management Committee.

b. When an inmate receives a serious disciplinary offense or refuses over a period of time to meet standards for responsible behavior or program participation, the Building Supervisor or higher authority can decide to immediately lower an inmate's status. The Building Management Committee will review all such actions.

**F. Level 6: SM2, SAM and Step-Down**

1. Following a successful period in IM or SM, inmates will be eligible for advancement and to step- down from Security Level S to their first introduction into general population at Security Level 6.

   a. Prior to advancement to Security Level 6, each inmate will be formally reviewed by the Institutional Classification Authority (ICA) in accordance with Operating Procedure 830.1, *Institution Classification Management.*
      1. Recommendations for advancement to Level 6 will be referred to the Dual Treatment Team.
      2. The Dual Treatment Team will escalate their recommendations to the Warden for final decision.

   b. The purpose of Security Level 6 is to reintroduce inmates into a social environment with other inmates,and to serve as a proving ground and preparation for stepping down to Security Level 5.

   c. At Security Level 6, Inmates are assigned to an appropriate program pod based upon the common characteristics and motivations that resulted in the inmate's assignment to Security Level S initially.

2. Level 6: SM2
   a. Unrestrained and observed movement within the pod
   b. Small group recreation
   c. Eligible for a job
   d. Meals will be eaten in cell.

3. Step-Down Pod - Security Level 6
   a. The Step-Down program is for previously SM inmates that do not meet the criteria for SAM. (IM inmates are not eligible for Step-Down Phase I/II) These are inmates with a lengthy history of disciplinary behavior including assaults (do not rise to the level of danger reserved for IM status). or multiple charges for non-compliance with facility rules. They have also satisfactorily completed the requirements for SM1 and SM2 indicating a new pattern of complying with rules and appropriate interactions with staff and other inmates. They will have also completed the Challenge Series Programming increasing the likelihood for a change in thinking and attitude and an increased sense of responsibility and maturity.

   a. Step-Down Phase I

Local Operating Procedure                                    Effective Date: 10/1/21

  1. Single Celled
  2. In-Pod group recreation one (1) tier at a time daily
  3. Outside group recreation one (1) tier at a time daily
  4. Programming will be conducted in small groups. The primary curriculum
     will be Thinking for a Change which may be supplemented with additional
     curriculum. The number of inmates placed within the group will be
     consistent with Thinking for a Change protocols.
  5. Walk to meals One (1) tier at a time with no more than one tier in the dining
     all at a time.

c. Step-Down Phase II

  1. Double celled when appropriate
  2. In-Pod group recreation one (1) tier at a time daily
  3. Outside group recreation one (1) tier at a time daily
  4. Programming will be conducted in small groups. The primary curriculum
     will be Thinking for a Change which may be supplemented with additional
     curriculum. The number of inmates placed within the group will be
     consistent with Thinking for a Change protocols.
  5. Walk to meals One (1) tier at a time with no more than one tier in the dining
     all at a time.

4. Secured Allied Management Pod (SAM)

  a. The SAM inmates are vulnerable to being victimization by others.
     Programming will focus on strategies to socially reintegrate inmates in
     preparation for advancement to Security Level 5.

  b. The following management protocols are in place for the SAM unit:
     1. Single-Celled Housing
     2. Unrestrained movement within the pod
     3. Unlimited phone call and kiosk privileges during periods of in-pod rec
     4. Eligible for a job
     5. Programming will be delivered in small groups in the pod
     6. The Challenge Series must be completed prior to entering these programs.
     7. Options: At a minimum of 30 days, inmates may participate in the
        following options upon being reviewed and approved by the
        Building Management Committee:
        • Group Meals in pod to one (1) tier at a time
        • In-pod group recreation with both tiers
        • Outside group recreation with both tiers

G. Level 6: IM Closed Pod

  1. Following a successful period in IM, inmates will be eligible for
     advancement and to step-down from Security Level S to their first
     introduction into general population at Security Level 6. The purpose of
     IM Level 6 is to create an opportunity for an increased quality of life for
     inmates possibly facing a long term in high security.

Local Operating Procedure                                        Effective Date: 10/1/21

2. Security Level 6, Phase I IM Closed Inmates will have increased privileges over Security Level S. Phase 1, IM Closed inmates can earn eligibility for additional privileges to include:
    1. Move unrestrained one (1) at a time in the pod while being observed for showers and meals.
    2. In-pod job assignments, (meeting specific eligibility criteria)
    3. Out of cell programming in secure chairs in small groups
    4. Video visitation and non-contact in person visitation.
    5. Productive activities such as a structured art program and creative writing with out of cell meeting in secure chairs
    6. Food Service support projects out of cell in secure chairs.
    7. Upon a 12 month, successful and charge free housing assignment in Phase I, an inmate may be eligible to progress to IM Phase II, upon approval by the Building Management Committee.

3. Inmates who have advanced to Phase II of this program will have the opportunity to earn eligibility for additional privileges to include:
    1. Continued privileges outlined in Phase I
    2. Contact visitation in secure chair
    3. Extended Commissary spend limits
    4. Additional phone privileges
    5. Walk individually to and from activities, such as recreation and showers at the discretion of the Building Management Committee.

## H. Level 6: Reentry Program

1. Level 6 Re-Entry Program has been developed at ROSP for inmates within the SM and IM pathways. These programs will address many of the identified risks and needs and prepare the inmate for return to the community. The Re-Entry program includes an accelerated level of programming and appropriate social interactions between the inmate, staff, and other inmates as part of a broader re-entry strategy to prepare them for return to the outside community. At two-years prior to release, Security Level S and Security Level 6 inmates will be reviewed by the Building Management Committee before being diverted into the Security Level 6 Reentry Program from whatever point they may be in the Level S step-down program. This will allow ample time to develop a success-based re-entry plan to obtain a GED, complete vocational training and to build a sufficient savings account.

2. Each inmate diverted into the reentry pathway should have their assessments reviewed or updated to include COMPAS assessments (risk/needs, CTS) by the Unit Manager and the Building Management Committee. Additionally, a Psychological Self-Efficacy Evaluation may be completed which will help assess the inmate's level of self-reliance, considered an important factor in their reliability to accomplish the multitude of tasks facing them at re-entry. This Evaluation will be conducted by a Mental Health Clinician and the results discussed with the Unit Manager and the Building Management Committee

3. Upon completion of the assessment, the inmate will be aligned with the appropriate programming.

   Some of the programs that are offered may include but are not limited to the following:

   - Aggressive Alternative Skills
   - P.R.E.P.S.
   - Challenge Series
   - Thinking for a Change
   - Thinking for a Change Aftercare
   - ServSafe
   - Ready to Work
   - Citizenship Journal
   - Re-Entry Planning
   - Re-Entry - Money Smart
   - Decision Points

4. The first six months of re-entry programming will be delivered to the inmates in the Security Chairs. In the second six-months inmates may be advanced to unsecured direct contact with staff that will occur one to one. During this time, the inmates may advance to small groups for programming with other reentry inmates participating in the program. The assessment of the inmate's readiness to advance will be determined by the Unit Manager and the Building Management Committee. Some factors to be considered are the behavior patterns of the inmate, the willingness of the inmate to participate in programming and the inmate's participation.

5. Special security measures can be implemented when needed to include specialized movement, programming being delivered by specially trained treatment officers, having K-9 present in front of the housing unit or additional officers present within the Reentry Pod. The decision to adapt the security measures would be made by the Unit Manager and the Building Management Committee.

6. Progression from restrained to unrestrained movement in Level 6 Re-Entry will be determined with the approval of the building committee.

7. For the final ten (10) months of reentry, Level 6 Re-Entry inmates may be reduced to Level 5 and transferred to a security level 5 intensive re-entry site.

## I. Review of Inmate Classification Assignments

1. Bi-Annual External Review Team

   a. A team external to ROSP will perform bi-annual reviews of each inmate's case assigned to ROSP in Security Level S and Security Level 6. The review will include, but not be limited to, the following areas:

      1. Is the inmate currently appropriately assigned to Security Level S?
      2. Does the inmate meet the criteria for the Intensive Management or

Special Management pathway to which they are assigned?

3. Does the inmate require a pathway change at this time?

4. Has the Dual Treatment Team made appropriate decisions to advance the inmate through the step-down process?

b. The External Review Team will consist of the following members or designee:

1. Security Operations Manager, Chairman

2. Regional Operations Chief of the Eastern and Central Regions

3. Chief of Inmate Management

4. Manager of Classification and Records

5. Evidence Based Practice Operations Administrator

6. Chief of Mental Health Services

7. Chief Nurse

### J. Western Regional Operations Chief, External Review

a. The Regional Operations Chief/Regional Administrator will provide an external review in the following situations:

1. In advance of inmate movement from any facility to ROSP for placement in Security Level S; the Regional Operations Chief must approve the transfer of any inmate to ROSP and assignment to Security Level S.

2. In advance of any change in inmate classification level including:

(a) Reassignment from a lower classification (other than Security Level 6) to Security Level S

(b) Reassignment from Security Level S to Security Level 6; the Regional Operations Chief or designee will review cases in which the two Wardens do not agree.

(c) Reassignment from Security Level 6 to Security Level 5

b. Wardens Review - Wardens are responsible for the following decisions:

1. For reassignment from Security Level S to Security Level 6 or Security Level 6 back to Security Level S, the decision will be made by the Warden of ROSP.

2. For Security Level 5 transfers from ROSP to WRSP, the decision will be made by consensus of the ROSP and WRSP Wardens. If consensus cannot be reached, the decision will be referred to the Regional Operations Chief.

c. Central Classification Services (CCS) Review

1. Reassignment from any all lower classification (security level 1-5) to Security Level S will result in the following approval process: Referring facility->Central Classification Services->Warden of the primary Maximum Security Prison (currently ROSP)->Regional Operations Chief (ROC) or designee Regional Administrator (RA)

2. The Warden and Western Regional Operations Chief or designee will have final approval for the increase of security level.

d. Dual Treatment Team Review

1. The Dual Treatment Team (DTT) refers to a team headed by both Chiefs of Housing and Program representing both ROSP and WRSP. Representatives from both ROSP and WRSP will make up the DTT may include, but not limited to, the following individuals or their designees:

   - Chief of Housing and Programs
   - IPM / Cognitive Counselor
   - Unit Manager
   - Investigator/ Intelligence Officer
   - Mental Health Clinician
   - Counselor (s) - Counselors directly involved in the management of the inmates beingreviewed should be utilized.
   - Corrections Officer - When possible, line staff members directly involved with themanagement of the inmates being reviewed should be involved.

The Dual Treatment Team is responsible to review individual inmates and make certain recommendations. Recommendations by the team are reached through dialogue and consensus. Decisions will not be made by a voting majority. The team is responsible to consider a variety of options, when necessary, until a recommendation is reached which all members can support. If there is difficulty reaching a consensus, then the team should default to the safer options. Decisions are the responsibility of the Wardens and Regional Operations Chief. The Dual Treatment Team will be responsible for the following reviews and recommendations:

   - The Dual Treatment Team will meet and interview inmates as part of the process in determining the inmate's pathway.
   - Assignment of Security Level S Intake/Orientation inmates at ROSP to IM or SM pathway
   - Assigning IM & SM inmates from Security Level S to Security Level 6

3. The work of the Dual Treatment Team requires not only an understanding of the criteria for the different inmate sub-groups, but also the use of judgment especially when making recommendations regarding IM inmates, level of danger and assignment to appropriate pathways. This committee will meet as circumstances deem necessary. Factors the Dual Treatment Team should review would include:

   - Identifying possible inmate motivators and triggers,
   - Investigating not only institutional adjustment history but the history of street behavior andcrimes,
   - Considering inmate intent in addition to the results of their actions,
   - Review and interpretation of assessment results (COMPAS)

   e. The Building Management Committee is responsible for convening at

least monthly to discuss inmates' pathways and unit incentives and sanctions. Recommendations by the team will be made through dialogue and consensus. Decisions will not be made by a voting majority. The committee is responsible for considering a variety of options, when necessary, until a recommendation is reached which all members can support. If there is difficulty reaching consensus, then the committee should default to the safer options. Decisions are the responsibility of the Chief of Housing and Programs. The Building Management Committee is responsible for the following reviews and recommendations:

- Assigning inmates to SM0 and SM I
- Assigning inmates to IM0, IM I, and IM2.
- Assigning inmates to return to earlier levels due to excessive disciplinary behavior or unsatisfactory performance.
- Discussing and preparing recommendations to be presented to the Dual Treatment Team and ICA.
- Discussing and adjusting individual pod incentives and sanctions based on behavior, infractions, incidents, etc.

f.  Facility Administrator Review

a. The facility administrator shall conduct a weekly review of all inmates assigned to Security Level S and Security Level 6 to include reasons why a less restrictive setting could not be utilized and to document a transitional action plan to release from Security Level S or Security Level 6 as soon as safely possible. This review shall be documented per guidelines in OP 425.4, *Management of Bed and Cell Assignments*.

b. Each Security Level S inmate will be reviewed at a minimum of every 90 days by the ICA, or more frequently as necessary, to ensure the reclassification of Security Level S inmates is consistent with policy.

g.  Step-Down Program Restorative Housing Unit Files

a. An organized Restorative Housing Unit file for each inmate containing all completed documents in the appropriate section as listed on OP 425.4, Attachment 2, Restorative Housing Unit-File Organization file. (5-ACI-4A-19)

b. A new Restorative Housing Unit file must be started with each period of assignment.

c. The Restorative Housing Unit Manager will audit each inmates' file weekly to review the file for required documentation and will document their audit on the Restorative Housing Unit File Audit 425_F12.

d. The Unit Manager will conduct a final audit of the inmate's file and will be documented on the Restorative Housing Unit File Audit 425_F12. Staff will retain Restorative Housing Unit files in accordance with the applicable Records Retention and Disposition Schedule; see Operating Procedure 025.3, Public Records Retention and Disposition.

Local Operating Procedure                                                                 Effective Date: 10/1/21

## REFERENCES
Operating Procedures:
 425.4 Management of Bed and Cell Assignment
 830.1 Institution Classification Management
 830.2 Security Level Classification
 841.4 Restorative Housing Units

## ATTACHMENTS
Attachment 1 - Intensive Management Privilege Level Chart
Attachment 2 – Special Intensive Management Status Rating Chart
Attachment 3 - Special Management Privilege Level Chart

## FORM CITATIONS

*Restorative Housing Unit File Audit* 425_F12

Signed in as **Virginia Department of Corrections.**                    *Attachment 3*

Lexis® |

## Document:              Va. Code Ann. § 53.1-10

| Go to ∨ |   | Search Document 🔍 |

‹ Previous                                                          Next ›

## Va. Code Ann. § 53.1-10

**Copy Citation**

Current through the 2023 Regular Session

**Code of Virginia 1950    Title 53.1. Prisons and Other Methods of Correction.
(Chs. 1 — 15)    Chapter 1. Administration Generally. (Arts. 1 — 3)    Article 3.
Department of Corrections and Director of Corrections. (§§ 53.1-8 — 53.1-
17.1)**

## § 53.1-10. Powers and duties of Director.

The Director shall be the chief executive officer of the Department and shall have the
following duties and powers:

**1.** To supervise and manage the Department and its system of state correctional facilities;

**2.** To implement the standards and goals of the Board as formulated for local and
community correctional programs and facilities and lock-ups;

**3.** To employ such personnel and develop and implement such programs as may be
necessary to carry out the provisions of this title, subject to Chapter 29 (§ 2.2-2900 et
seq.) of Title 2.2, and within the limits of appropriations made therefor by the General
Assembly;

**4.** To establish and maintain a general system of schools for persons committed to the
institutions and community-based programs for adults as set forth in § 53.1-67.9. Such
system shall include, as applicable, elementary, secondary, postsecondary, career and
technical education, adult, and special education schools.

**a.** The Director shall employ a Superintendent who will oversee the operation of
educational and vocational programs in all institutions and community-based programs for
adults as set forth in § 53.1-67.9 operated by the Department. The Department shall be
designated as a local education agency (LEA) but shall not be eligible to receive state
funds appropriated for direct aid to public education.

**b.** When the Department employs a teacher licensed by the Board of Education to provide
instruction in the schools of the correctional centers, the Department of Human Resource
Management shall establish salary schedules for the teachers which endeavor to be

competitive with those in effect for the school division in which the correctional center is located.

**c.** The Superintendent shall develop a functional literacy program for inmates testing below a selected grade level, which shall be at least at the twelfth grade level. The program shall include guidelines for implementation and test administration, participation requirements, criteria for satisfactory completion, and a strategic plan for encouraging enrollment at an institution of higher education or an accredited vocational training program or other accredited continuing education program.

**d.** For the purposes of this section, the term "functional literacy" shall mean those educational skills necessary to function independently in society, including, but not limited to, reading, writing, comprehension, and arithmetic computation.

**e.** In evaluating a prisoner's educational needs and abilities pursuant to § 53.1-32.1, the Superintendent shall create a system for identifying prisoners with learning disabilities.

**5.**

**a.** To make and enter into all contracts and agreements necessary or incidental to the performance of the Department's duties and the execution of its powers under this title, including, but not limited to, contracts with the United States, other states, and agencies and governmental subdivisions of this Commonwealth, and contracts with corporations, partnerships, or individuals which include, but are not limited to, the purchase of water or wastewater treatment services or both as necessary for the expansion or construction of correctional facilities;

**b.** Notwithstanding the Director's discretion to make and enter into all contracts and agreements necessary or incidental to the performance of the Department's duties and the execution of its powers under this title, upon determining that it shall be desirable to contract with a public or private entity for the provision of community-based residential services pursuant to Chapter 5 (§ 53.1-177 et seq.), the Director shall notify the local governing body of the jurisdiction in which the facility is to be located of the proposal and of the facility's proposed location and provide notice, where requested, to the chief law-enforcement officer for such locality when an offender is placed in the facility at issue;

**c.** Notwithstanding the Director's discretion to make and enter into all contracts and agreements necessary or incidental to the performance of the Department's duties and the execution of its powers under this title, upon determining that it is necessary to transport Virginia prisoners through or to another state and for other states to transport their prisoners within the Commonwealth, the Director may execute reciprocal agreements with other states' corrections agencies governing such transports that shall include provisions allowing each state to retain authority over its prisoners while in the other state.

**6.** To accept, hold and enjoy gifts, donations and bequests on behalf of the Department from the United States government and agencies and instrumentalities thereof, and any other source, subject to the approval of the Governor. To these ends, the Director shall have the power to comply with such conditions and execute such agreements as may be necessary, convenient or desirable;

**7.** To collect data pertaining to the demographic characteristics of adults, and juveniles who are adjudicated as adults, incarcerated in state correctional institutions, including, but not limited to, the race or ethnicity, age, and gender of such persons, whether they are a member of a criminal gang, and the types of and extent to which health-related problems are prevalent among such persons. Beginning July 1, 1997, such data shall be collected, tabulated quarterly, and reported by the Director to the Governor and the General

Assembly at each regular session of the General Assembly thereafter. The report shall be submitted as provided in the procedures of the Division of Legislative Automated Systems for the processing of legislative documents and reports;

8. To make application to the appropriate state and federal entities so as to provide any prisoner who is committed to the custody of the state a Department of Motor Vehicles approved identification card that would expire 90 days from issuance, a copy of his birth certificate if such person was born in the Commonwealth, and a social security card from the Social Security Administration;

9. To forward to the Commonwealth's Attorneys' Services Council, updated on a monthly basis, a list of all identified criminal gang members incarcerated in state correctional institutions. The list shall contain identifying information for each criminal gang member, as well as his criminal record;

10. To give notice, to the attorney for the Commonwealth prosecuting a defendant for an offense that occurred in a state correctional facility, of that defendant's known gang membership. The notice shall contain identifying information for each criminal gang member as well as his criminal record;

11. To designate employees of the Department with internal investigations authority to have the same power as a sheriff or a law-enforcement officer in the investigation of allegations of criminal behavior affecting the operations of the Department. Such employees shall be subject to any minimum training standards established by the Department of Criminal Justice Services under § 9.1-102 for law-enforcement officers prior to exercising any law-enforcement power granted under this subdivision. Nothing in this section shall be construed to grant the Department any authority over the operation and security of local jails not specified in any other provision of law. The Department shall investigate allegations of criminal behavior in accordance with a written agreement entered into with the Department of State Police. The Department shall not investigate any action falling within the authority vested in the Office of the State Inspector General pursuant to Chapter 3.2 (§ 2.2-307 et seq.) of Title 2.2 unless specifically authorized by the Office of the State Inspector General;,

12. To prescribe and enforce rules prohibiting the possession of obscene materials, as defined in Article 5 (§ 18.2-372 et seq.) of Chapter 8 of Title 18.2, by prisoners incarcerated in state correctional facilities;

13. To develop and administer a survey of each correctional officer, as defined in § 53.1-1, who resigns, is terminated, or is transitioned to a position other than correctional officer for the purpose of evaluating employment conditions and factors that contribute to or impede the retention of correctional officers;

14. To promulgate regulations pursuant to the Administrative Process Act (§ 2.2-4000 et seq.) to effectuate the provisions of Chapter 5.1 (§ 32.1-162.16 et seq.) of Title 32.1 for human research, as defined in § 32.1-162.16, to be conducted or authorized by the Department. The regulations shall require the human research committee to submit to the Governor, the General Assembly, and the Director or his designee at least annually a report on the human research projects reviewed and approved by the committee and shall require the committee to report any significant deviations from the proposals as approved; and

15. To provide, pursuant to § 24.2-314, to the Division of Legislative Services, not later than July 1 of any year in which the decennial census is taken and in a format specified by the Division of Legislative Services, information regarding each person incarcerated in a state correctional facility on April 1 of that year. Such information shall include, for each

person incarcerated, (i) a unique identifier, other than his name or offender identification number, assigned by the Director; (ii) his residential street address at the time of incarceration, or other legal residence, if known; (iii) his race, his ethnicity as identified by him, and whether he is 18 years of age or older; and (iv) the street address of the correctional facility in which he was incarcerated on April 1 of that year.

## History

Code 1950, §§ 53-19.8, 53-19.14; 1974, cc. 44, 45; 1982, c. 636; 1994, 2nd Sp. Sess., c. 7; 1995, c. 725; 1997, c. 894; 2003, cc. 94, 516, 854; 2006, cc. 431, 500; 2007, c. 392; 2009, cc. 39, 621; 2012, cc. 803, 835; 2013, cc. 143, 214; 2014, c. 84; 2015, cc. 99, 293; 2016, c. 205; 2019, c. 618; 2020, cc. 759, 1229, 1265.

▼ Annotations

## Notes

**Editor's note.**

Acts 2006, cc. 431 and 500, which added subdivision 8, in cl. 2 provide: "That the information forwarded by the Department of Corrections and the Department of Juvenile Justice to the Commonwealth's Attorneys' Services Council shall be in a form mutually agreeable to all parties."

At the direction of the Virginia Code Commission, the following changes were made to conform to Acts 2016, c. 588: in subdivision 4, substituted "postsecondary" for "post-secondary"; and in subdivision 4 c, substituted "at an institution of higher education" for "in college."

Acts 2018, c. 815, cl. 1 provides: "§ 1. The State Board of Corrections shall adopt and implement a standard to ensure the provision of feminine hygiene products to female inmates without charge.

"§ 2. The Director of the Department of Corrections shall adopt and implement a policy and procedure to ensure the provision of feminine hygiene products to female prisoners without charge."

Acts 2019, c. 303 provides: "§ 1. The Director of the Department of Corrections shall review the Department's visitation policies concerning visitors' wearing of tampons or menstrual cups at state correctional facilities and shall revise such policies as necessary to permit such visitors to wear tampons or menstrual cups. The Department shall make the policy available to the public as soon as practicable and shall provide a copy to the Chairmen of the House Committee on Militia, Police and